HARRIS v. EQUITABLE LIFE ASSURANCE SOCIETY.

*Insurance — life policy — conditions — renewal of lapsed policy. Estoppel — retention of premiums on void policy.*

A life insurance policy contained provisions that if any false statements were made in the application, or if there should be any default in the payment of premiums to become due, etc., the policy should be void, and the premiums paid forfeited to the company. There was a failure to pay several premiums, whereby the policy lapsed. While the person whose life was insured was in her last sickness, plaintiff, who was interested in the policy, applied to have it restored, and upon his giving a certificate which falsely stated that she was " equally well and in as good assurable condition as when examined for assurance, not having been sick since that time," and the payment of the back premiums, the policy was renewed. The person whose life was insured died a few days thereafter. Upon proof of death, the company refused to pay the amount of the policy, but did not return the premiums. *Held,* in an action upon the policy, (1) that the company were not liable, and (2) that the failure to return the premiums, upon discovery of the true facts, was not a ratification of the contract of renewal so as to estop the company from setting up the invalidity of the policy.

APPEAL by defendant from a judgment in favor of plaintiff, entered upon a verdict directed by the court.

The action was brought by Marx Harris against the Equitable Life Assurance Society of the United States upon a policy of life insurance. The facts fully appear in the opinion.

*Henry Day* and *George De Forest Lord,* for appellant.

*R. W. Townsend* and *A. R. Dyett,* for respondent.

Present — DAVIS, P. J., BRADY and DANIELS, JJ.

DAVIS, P. J.   On the 18th day of May, 1869, the plaintiff made application to the defendants for an assurance of $3,000 upon the life of his wife.   His application stated, among other things, that she had not had any of a long list of diseases, among which rheumatism, disease of the heart, of the urinary organs, or of any vital part, were specified.   Mrs. Harris was examined by the medical examiner of the defendants, and found to be in such condition of health that he approved of and recommended the assurance.   The application was subscribed by both plaintiff and his wife, and contained a declaration that the answers to the questions contained therein were fair and true, and an agreement on their part that the statements therein should form the basis of the contract for assurance, and that any untrue or fraudulent answers, or any suppression of facts in regard to her health, should render the policy null and void.   On the 1st day of June, 1869, a policy, on this application, was issued upon the life of Mrs. Harris for $3,000, payable to the plaintiff in consideration of the premium then paid, and of $26.16, payable quarterly, on or before the 1st days of September, December, March and June of each year.

The policy states that it was issued and accepted by the assured upon the conditions and agreements indorsed thereon, amongst which were the following:   "If the declaration made by the applicant for the policy, or if any statement respecting the person, or family of the person, whose life is hereby assured, submitted by such person to this society, and upon the faith of which declaration or statement this policy is issued, shall be found in any respect untrue, then and in every such case this policy shall be null and void.   And if the premiums as herein stipulated shall not be paid on or before the days herein mentioned for the payment thereof, at the office of the society in the city of New York   *   *   *   then, and in every such case, this society shall not be liable for the payment of the sum assured, or any part thereof, and this policy shall cease and determine."   And, "In every case when this policy shall cease and determine, or become null and void, all payments thereon shall be forfeited to the society."

The premium of $26.48 which fell due on the 1st day of September, 1869, was not paid; nor were either of the premiums paid, which would have become due on the first of December and first of March.

About the 1st of February, 1870, Mrs. Harris had a severe

attack of inflammatory rheumatism. Her family physician was called in, and attended her almost daily through February and March and until her death in April. He testified that she suffered a great deal, until about the middle or 20th of March, when she became so much improved that he had hopes of her recovery, but a few days afterward she was taken with symptoms very grave, which indicated trouble in the heart, and in the lungs, and in the kidneys, and he found it necessary to ask for a consulting physician, and mentioned to plaintiff that he would like to have Dr. Alonzo Clark to assist in the case. Dr. Clark was called in consultation on the 20th day of March, and he says that he regarded her case as a grave one, and feared that it would terminate fatally; that she was in bed, gravely sick, which would appear to any one who came into the room, professional or unprofessional. He continued to attend her, making seven visits of consultation before her decease.

On the 28th day of March the plaintiff went to the defendants' office, and applied to have the policy on his wife's life restored. He stated, in answer to questions put to him by the defendants' actuary, that his wife was then in good health and had not been sick since she was examined for insurance, and signed a certificate which was prepared by the officer in these words:

"NEW YORK, *March* 28, 1870.
"Mrs. Rachel Harris is now equally well and in as good assurable condition as on May 18, 1869, when examined for assurance under policy No. 43,788, not having been sick since that time.
"W. HARRIS."

The actuary then authorized the receipt of the premiums, and plaintiff paid the same, amounting to $78.48, and received the following:

"92 BROADWAY, NEW YORK, *September* 1, 1869.
"Received seventy-eight $\frac{48}{100}$ dollars, continuing in force policy No. 43,788 on the life of Mrs. Rachel Harris from the first day of September, 1869, to the first day of June, 1870.
"G. N. PHILLIPS, *Actuary.*"
"T. D. JORDAN, *Cashier.*"

Mrs. Harris died on the 3d day of April, 1870, of heart disease, acute pneumonia and Bright's disease or congestion of the kidneys,

which her doctor attributes as the primary cause to her attack of inflammatory rheumatism. Proofs of death were delivered to the defendants the latter part of April, amongst which was the affidavit of the attending physician, who stated that he attended Mrs. Harris during her last illness, that he was called about the 1st of February, 1870, and continued in attendance till the time of her death; that the immediate cause of her death was heart disease, its remote cause rheumatic affection, and that she had also disease of the kidneys and lungs.

After the expiration of sixty days, and about the 1st of July, 1870, the defendants refusing to pay the amount insured, this action was brought. Afterward, and before answering, the defendants served an offer to allow judgment to be entered against them for the same amount as the premium paid on the 28th day of March, with interest from that day and costs.

After the evidence on both sides was closed, the court held that it was the duty of the defendants, at the time of the discovery of the fraud, to have returned, or offered to return, the premiums paid March 28, 1870, and to disaffirm the new contract, and that "never having offered to return the premiums, by which the original contract was brought into existence again, the defendants offered no defense." Upon this ground, the court directed a verdict for the plaintiff for the full amount of the policy and interest. The defendants duly excepted.

The fraud practiced by the plaintiff upon the defendants, as shown by their evidence, was a bold and gross one. The proofs of death furnished by plaintiff contained facts sufficient, as it is claimed, to inform defendants that the fraud had been committed. By the terms of the policy, the sum insured would be payable at the end of sixty days after the delivery of such proofs, and the suit was not brought till a few days after the lapse of that period. It is claimed, and was substantially so held by the court below, that the defendants' only remedy for such fraud lay in a rescission of the contract, by offering, before the suit was brought, to return the premiums paid on the 28th of March, and declaring the contract void, and not having done so, they had elected to affirm the contract and were liable on the policy.

The plaintiff testified that after the expiration of the sixty days, he called for payment, which was refused ; the president of defend-

ants saying, "You will have to sue us." This, certainly, was no ratification *in fact*.

It was notice to plaintiff that the defendants had not ratified the contract, and the only question is whether, under the circumstances, the omission to tender back the premiums had such *legal force and effect* that the right to assert the fraud in defense was wholly gone. The effect of the failure to pay premiums was expressly stipulated, by the agreement of the parties. In that event the policy was to cease and determine. The premiums paid only covered the risk for the expired period. There was, therefore, no existing contract between the parties on the 28th of March. By the plaintiff's own election, the policy had "ceased and determined." It was not, therefore, the waiver of a forfeiture which he sought, for the refusal of which he could ask for relief in a court of equity or elsewhere; but for the reinstatement of an expired contract upon such terms as the parties should agree upon.

In legal effect this was precisely equivalent to the taking out of a new policy, upon the terms of the old one, the only difference being that the representations as to the condition of the health of the insured should be regarded as repeated at the date of the renewal, with such modifications as the parties then made and accepted; the premiums, instead of being at the large rate that the advance in age might require, should be the sums that would have kept the policy in force, if the parties had chosen to pay, in accordance with the original contract. We have, therefore, to look at the representation in writing, made by the applicant, for the renewal on the 28th day of March, and incorporate it with the contract or renewed policy, so as to find the real intention and agreement of the parties made at that date. By it the plaintiff represents that "Mrs. Harris is now equally well, and in good assurable condition as in May 18, 1869, when examined for assurance under policy No. 43,788, not having been sick since that time." This distinctly refers to and adopts the medical examination which had been made on the 18th of May previous, and affirms that the condition of things therein stated is the same now. It affirms, also, all the representations as to the condition of Mrs. Harris' health, when the policy was first issued, as contained in the plaintiff's application for assurance, and it attaches to the representations now made the same contract and consequences that were attached by the former agreement to the representations then

made. The plaintiff, by that contract, agreed that the statements made should "form the basis of the contract for assurance, and, also, that any untrue or fraudulent answer, or any suppression of facts in regard to the person's health, * * * will render the policy null and void, and forfeit all payments made thereon."

By the new contract he repeated those representations, with the addition of those contained in the written statement, and made them the basis of the renewed contracts with the same stipulated consequence for falsity and fraud in either.

The law works out the new contract in this form, not only in the interest of justice and right, but because that was the manifest intent of the parties, unless we assume that one of them was intending trickery and bad faith. The result is that the plaintiff made it a part of the new contract that if his representations of March 28th were untrue or fraudulent, the renewed policy should be void, and the premiums paid should be forfeited, and he has no right to insist that the premiums shall be returned to him before his falsity and fraud can be set up as a defense. There is, in such case, no necessity for rescission, but only for enforcement of the contract of the parties, as the latter gives, not only a complete remedy against the contract, but the additional remedy of a forfeiture of the premiums, which forfeiture the plaintiff has expressly agreed shall be the consequence of his own fraud.

There seems to us no good reason to doubt that the defendants might stand securely upon this ground, if the jury found the plaintiff guilty of the alleged fraud. In that case the defendants have only to affirm, and not to disaffirm the real contract to make their defense complete.

But we are also of opinion that the application to this case of the principle governing the rescission of contracts was improperly made. The substance of that principle of law is that a party who has been defrauded in the making of a contract, and who wishes, by an action at law, to avoid the contract for fraud, and reinstate himself in the possession of the property parted with, or to recover its value before maturity of the contract, must return or offer to return to the other party before commencing his action, whatever he has received under the contract, unless it be of a character that its return at the trial, or in the progress of the suit, will leave such party in as good condition as the return or offer before suit would have done.

This is the rule where the innocent and injured party takes the offensive against the wrong-doer to treat the contract as a nullity because of his fraud. But what is the rule where the guilty party becomes the actor and seeks the fruit of his fraud by enforcing the contract against the injured party? There is certainly good reason for saying that in the latter case the rule, if applicable at all, must be subject to serious modifications. The vendor of real or personal property who, under the form of a contract, has been led by fraud to part with its possession, or with evidence of title, occupies a relation to the transaction very different from that of a purchaser who has been induced to buy by the fraud of his vendor.

The latter may use the fraud as a sword or shield, without the rescission of the contract; and he may also rescind and take his remedy for the consideration parted with, by properly electing that remedy. He never, however, loses the shield when the fraudulent vendor assails him upon the contract, but may assert the fraud as a total or partial defense.

That rule was asserted in *Whitney* v. *Allaire*, 1 N. Y. 305, in which it was held that a lessee by taking possession at the commencement of the term, and after having discovered the fraud, waives thereby only his right to rescind the contract but not his right to recover his damages occasioned by the fraud. In that case the defendant was induced to make a contract through the fraudulent representations of the plaintiff, that the rights mentioned in the lease comprehended a parcel of land which in fact belonged to the corporation of New York. The lease was for one year, from the first day of May, at the rent of $1,000. The defendant discovered the fraud before the first of May, and obtained from the corporation a lease of that parcel at an annual rent of $1,000. It was held in an action for the rent, that the fraud was properly set up as a defense, and that the measure of damages was what the defendants had in good faith been obliged to pay to the corporation for the second lease, and a verdict for the defendant was sanctioned. In the same case, in the Supreme Court, COWEN, J., says: " Once established, that in all matters of pecuniary dealings, in all matters of contract, a man has a legal right to demand that his neighbor shall be honest, and the consequence follows, viz., if he be drawn into a contract by fraud, this is an injury actionable *per se.*" *Allaire* v. *Whitney*, 1 Hill, 484.

Indeed, it would not be difficult in all such cases to show the

degree of actual damage.   The time of the injured party has been consumed in doing a vain thing, or one comparatively vain ; and time is money.   It would not be difficult to satisfy the more ancient and strict rule of the year book, 19 H. 6, 44, Pl. 92, viz.: "That there must not only be a thing done amiss but also damage, either already fallen upon the party or else inevitable." *Waters* v. *Freeman,* Hob. 267.

"Fraud is a thing grievously amiss, and above all, odious to the law; and fraud in a contract can hardly be conceived without being attended with damage in fact."   When *Whitney* v. *Allaire* was before the Supreme Court, after the second trial, the court said, JEWETT, J., delivering the opinion (speaking of frauds perpetrated by the vendor): "A return of the property to the vendor, or an offer to return, is in no case necessary except to enable the vendee to withhold or recover back the price.   *   *   *   In all cases of fraud the vendee who alone has the right of disaffirmance may remain silent and bring his action to recover damages for the fraud, or may rely on it by way of defense to the action of the vendor, although there has been full acceptance by him with knowledge of the defects of the property.   An affirmance of the contract by the vendee with such knowledge, merely extinguishes his right to rescind the sale.   His other remedies remain unimpaired.   The vendor can never complain that the vendee has not rescinded." *Whitney* v. *Allaire,* 4 Denio, 554, 558, and cases there cited ; and see *Muller* v. *Eno,* 14 N. Y. 597.

It is not easy to see why the principle of these cases is not applicable to the case under consideration.   The plaintiff, by a gross fraud, induced the defendants to re-instate a contract which had terminated by its express terms, on payment of a small sum of money.   The contract subjects the defendants to pay $3,000, and for that sum the plaintiff sues.   The defendants set up the fraud as a defense.   Their right of action for the fraud is perfect, and the measure of their damages would be the amount of the obligation fraudulently obtained, less perhaps the premiums paid.   *Decker* v. *Mathews,* 12 N. Y. 313; *Ingalls* v. *Lord,* 1 Cow. 240.

But their right to defend is as complete as their right to sue, and the measure of damages is the same.   On what ground is that defense to be cut off ?   Certainly not on the ground that a rescission was necessary, for that was only essential to a particular form of remedy.   Certainly not on the ground of ratification, for noth-

ing of that kind can be predicated upon a distinct refusal to pay the fraudulent obligation, followed almost immediately by a suit, and a plea of the fraud in bar. It is not a case where the parties, after knowledge of fraud, have continued to receive subsequently accruing premiums, and thereby, in continuing the contract with knowledge, have estopped themselves from alleging the fraud. It is a case, rather, where the relations have not been changed since the discovery of the fraud, and where it is absurd to suppose that, with knowledge of the fraud, and while refusing to pay, the defendants meant to ratify an obligation for $3,000 by retaining $78. If the policy had been negotiable within the law merchant, and had been assigned by plaintiff to a *bona fide* holder within the well-established rule, an action would have been sustained against plaintiff at the time the fraud was discovered, in which the measure of damages would have been the amount of the assurance, less, perhaps, the premium paid. *Decker* v. *Mathews*, 13 N. Y. 313, *Murray* v. *Burling*, 10 Johns. 172; *Evans* v. *Kymer*, 1 Barn. & Ald. 528. And the only reason that can be assigned why the action would not lie against plaintiff upon the same facts, at the same time, for the same amount of damages, is that the defense to the policy would be perfect, and, therefore, there could be only nominal damages in such a suit. Cases last cited.

But if it be true that a rescission was necessary in order to establish the defense, we are of opinion that sufficient was done to accomplish that purpose. This action was brought very speedily after the right of action accrued under the policy. A plaintiff, to rescind, has the opportunity to take the necessary steps before action, because the time of commencing suit is within his control. But even he may not offer to return, where what he has received is of such a nature that he can bring it into court and cancel or tender it, so as effectually to put the defendant in a position equally as good as an offer before suit could have done. *Ladd* v. *Moore*, 3 Sandf. 589; *Nichols* v. *Michael*, 23 N. Y. 264.

In *Ladd* v. *Moore*, the plaintiff had received a note and money, but he was not required to bring in the money at the time of bringing in the note on the trial. There is good reason for holding that a defendant who is sued by a party who has fraudulently obtained his obligation, is not to be held to any sharp rule of return, or offer to return, before suit is brought. Such a rule would be highly advantageous to sharpers, and severe oftentimes upon their victims. In

such a case, if the suit be brought soon after the right of action accrues, it ought to be enough that the defendant offers .to replace the party in the position he was when he committed the fraud.

The defendants, before issue, offered judgment under the Code, for the full amount of the premiums, and interest, with costs of the action. This was, under the circumstances, we think, a compliance with the spirit of the rule. It ought to be so held especially in a case where it is apparent that no offer would have been accepted whenever made. The rule itself was established to promote justice, and not to enable fraud to consummate its purposes. The application of it in this case, in the strictness claimed, is to pervert the rule into a handmaid of iniquity.

The judgment should be reversed and a new trial ordered, with costs to abide the event.

DANIELS, J. I concur on the ground that the policy was void, on account of the fraud shown by the evidence.

*Judgment reversed and new trial ordered.*